UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
CLERK
12:21 pm, Jul 09, 2024
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

---------------------------------------------------------------------X

NORMAN C. RABIN, CATHERINE E. RYAN,
LISA R. WALLER, PETER D. ROSENHOLM,
J. CHAD VANDERGRIFF, JOY N. MACK,

                            Plaintiffs,              **MEMORANDUM & ORDER**
                                                      23-cv-402 (JMA) (SIL)

              -against-

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,
and Secretary Xavier Becerra, [in his official capacity,] U.S.
DEPT. OF HOMELAND SECURITY, and DHS Secretary
Alejandro Mayorkas, U.S. DEPT. OF AGRICULTURE, and DOA
Secretary Thomas J. Vilsack, U.S. DEPT. OF ENERGY, and DOE
Secretary Jennifer M. Granholm, NATIONAL AERONAUTICS
AND SPACE ADMINISTRATION, and NASA Administrator
Bill Nelson, U.S. DEPT. OF COMMERCE, and DOC Secretary
Gina M. Raimondo, SOCIAL SECURITY ADMINISTRATION,
and SSA Acting Commissioner Dr. Kilolo Kijakazi, U.S. AGENCY
FOR INTERNATIONAL DEVELOPMENT, and USAID
Administrator Samantha Power, U.S. DEPT. OF HOUSING AND
URBAN DEVELOPMENT, and HUD Secretary Marsha L. Fudge,
U.S. DEPT. OF LABOR, and DOL Secretary Martin J. Walsh, U.S.
DEPARTMENT OF DEFENSE, DOD Secretary Lloyd J. Austin III,
U.S. DEPARTMENT OF EDUCATION, and DOEdu Secretary Dr.
Miguel Cardona, U.S. DEPARTMENT OF VETERANS AFFAIRS,
and DVA Secretary Denis R. McDonough, ENVIRONMENTAL
PROTECTION AGENCY, and EPA Administrator Michael S. Regan,
NATIONAL SCIENCE FOUNDATION, and NSF Director Dr.
Sethuraman Panchanathan, U.S. DEPARTMENT OF TRANSPORTATION,
and DOT Secretary Pete Buttigieg, U.S. DEPARTMENT OF JUSTICE,
and U.S. Attorney General Merrick B. Garland, HHS OFFICE FOR
HUMAN RESEARCH PROTECTIONS, and OHRP Acting Director
Julie Kaneshiro, [all officials are in their official capacity], and U.S.A.,

                                Defendants.
---------------------------------------------------------------------X

**AZRACK, United States District Judge:**

     Plaintiffs Norman Rabin, Catherine Ryan, Lisa Waller, Peter Rosenholm, J. Chad

Vandergriff, and Joy N. Mack bring this action under the Administrative Procedure Act ("APA"),

5 U.S.C. §§ 701–706, and name as defendants nineteen federal agencies and their heads in an official capacity.[1]  Plaintiffs' Amended Complaint alleges that: (1) Plaintiffs are victims of ongoing non-consensual human testing and assault technologies by the United States government; (2) the United States government has subjected Plaintiffs—and other alleged victims—to years of illegal "hi-tech" surveillance; and (3) Defendants' actions as part of the "Revised Common Rule"—45 C.F.R. Part 46, the federal regulations relating to research involving human test subjects—were arbitrary and capricious under the APA because the regulations should have, but did not, protect victims of illegal and non-consensual surveillance.

Defendants move to dismiss Plaintiffs' Amended Complaint with prejudice under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Defendants argue: (1) Plaintiffs lack standing under Article III to bring this action; (2) the Amended Complaint does not state specific allegations of how Defendants' notice of proposed rulemaking allegedly violated the APA; (3) to the extent the Amended Complaint raises alleged violations of constitutional rights, the United States has not waived sovereign immunity for such claims; and (4) Plaintiffs' allegations rise to the level of irrational or the wholly incredible and can only be properly dismissed as the product of delusion or fantasy.

For the below reasons, the Court dismisses the Plaintiffs' Amended Complaint with prejudice.

---

[1]      The federal agency defendants include: (1) the United States Department of Health and Human Services ("HHS"), (2) the United States Department of Homeland Security, (3) the United States Department of Agriculture, (4) the United States Department of Energy, (5) National Aeronautics and Space Administration, (6) the United States Department of Commerce, (8) the Social Security Administration, (9) the United States Agency for International Development, (10) the United States Department of Housing and Urban Development, (11) the United States Department of Labor, (12) the United States Department of Defense, (13) the United States Department of Education, (14) the United States Department of Veterans Affairs, (15) the Environmental Protection Agency, (16) the National Science Foundation, (17) the United States Department of Transportation, (18) the United States Department of Justice, and (19) the United States Attorney General, the HHS Office for Human Research Protections, and the United States of America ("Defendants").

# I.     BACKGROUND[2]

## A.     <u>The Relevant History of the Revised Common Rule</u>

"The Federal rules that protect people who participate in research were initially published by the Department of Health and Human Services ('HHS').  The first section of the HHS rules (Subpart A) is called the Common Rule because it was simultaneously adopted by 15 Federal departments and agencies in 1991."  <u>See</u> https://www.hhs.gov/ohrp/education-andoutreach/about-research-participation/protecting-research-volunteers/principal-regulations (last visited July 8, 2024); <u>see also</u> 56 Fed. Reg. 28025 (June 18, 1991).  In 1997, President Clinton issued a memorandum entitled "Strengthened Protections for Human Subjects of Classified Research" directing government agencies to develop a revised common rule to address the treatment of human test subjects.  <u>See</u> 62 Fed. Reg. 26369 (May 13, 1997).

The Office for Human Research Protections ("OHRP") was created in 2000 to, among other things, "fulfill responsibilities set forth in the Public Health Service Act" including: "(1) developing and monitoring as well as exercising compliance oversight relative to HHS Regulations for the protection of human subjects in research conducted or supported by any component of the Department of Health and Human Services ('HHS'); and (2) coordinating appropriate HHS regulations, policies, and procedures both within HHS and in coordination with other Departments and Agencies in the Federal Government."[3]  65 Fed. Reg. 114, 37136, 37137 (June 13, 2000).

---

[2]     This Memorandum and Order draws its facts from Plaintiffs' Amended Complaint (ECF No. 18 ("AC")); Defendants' Memorandum of Law in Support of their Motion to Dismiss (ECF No. 32 ("Defs.' Mot.")); Defendants' Affidavits, Declarations, and Accompanying Exhibits in Support of their Motion to Dismiss (ECF No. 33-1-3); Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss (ECF No. 35 ("Pls.' Opp.")); Plaintiffs' Declaration, Affidavits, Exhibits, and Appendices in Support of their Opposition to Defendants' Motion to Dismiss (ECF No. 39-1-7); and Defendants' Reply Memorandum of Law in Support of their Motion to Dismiss (ECF No. 37 ("Pls.' Rep.").)

[3]     A complete history of OHRP and the history of the Revised Common Rule, including videotaped public hearings, may be found at: https://www.hhs.gov/ohrp/index.html (last visited July 8, 2024).

An advanced notice of proposed rulemaking ("ANPRM") was published and sought public comments on seventy-four specific questions about revising the Common Rule.  See 76 Fed. Reg. 44512, 44529 ("When submitting responses to the specific questions asked in this notice, please cite the specific question by number. In addition to the specific solicitation of comments throughout this ANPRM, general comment is invited on the current system of protections for human research subjects as implemented through the Common Rule, the HIPAA Privacy and Security Rules, and any other rules, regulations or guidance documents.").  A Notice of Proposed Rulemaking ("NPRM") was published on September 8, 2015 and sought additional public comments.  See 80 Fed. Reg. 53933 (September 8, 2015).  The Common Rule was revised in 2017 and adopted by several federal agencies.  See 82 Fed. Reg. 7149 (January 19, 2017).

**B.**    **Factual Background**

As a general matter, Plaintiffs allege that Defendants' actions as part of the Revised Common Rule were arbitrary and capricious in violation of the APA.  (See generally AC, ¶ 1.) Specifically, Plaintiffs allege that the Revised Common Rule: (1) does not adequately protect "citizens from non-consensual human research," (id. at ℙ 1(A)); (2) "does not address classified human research protections which were found to be inadequate in the mid to late 1990s…," (id. at ℙ 1(B)); (3) was unreasonably delayed, (id. at ℙ 1(C)); (4) "does not reasonably address the rulemaking administrative record being filled with the preponderance of consistent allegations of a yet-ongoing modern day 'high tech' Tuskegee experiment and which is larger in total number of victims than 'Tuskegee,'"[4] (id. at ℙ 1(D)); (5) enacted a "vicious Grandfather clause" … "which enabled existing human research programs when an Agency of Department Head had waived

---

[4]      The "Tuskegee" experiment was a study conducted by the United States Public Health Service between 1932 and 1972.  "The study was intended to observe the natural history of untreated syphilis.  As part of the study, researchers did not collect informed consent from participants and they did not offer treatment, even after it was widely available.  The study ended in 1972 on the recommendation of an Ad Hoc Advisory Panel, convened by the Assistant Secretary for Health and Scientific Affairs, following publication of news articles about the study."  See https://www.cdc.gov/tuskegee/about.html (last visited July 8, 2024).

Informed Consent to continue under the old un-restricted Waiver Clause, thereby robbing victims of the hope and actuality that many victims might become freed from the cruel day and night non-consensual testing…," (id. at ⁋ 1(E)); and (6) "ignored numerous, rational and reasonable 'Victim Stakeholder' Public Comments … to not be subjected to violations of the security of one's person, and the privacy of one's internal bodily processes (including one's thoughts) by high-tech electromagnetic signals monitoring and assault/harassment of the human body and brain, typically day and night." (Id. at ⁋ 1(F)).

Plaintiffs refer to themselves as "alleged/actual" victims that "seek to attempt to represent some of the interests of victims of [o]ngoing alleged and actual non-consensual human testing by [the] U.S. Government. . . .[.]" (AC ⁋ 2.) More specifically, Plaintiffs allege that they are "victims of many years of alleged and actual non-consensual human testing of hi tech surveillance, monitoring, and assault technologies through advanced signals processing methods of aiming customized-to-the-person's-body electromagnetic signals at the person; obtaining the returning signal(s); 'micro-analyzing' the return signal(s) for information; and, then, thereupon, to modulate the next 'second' or 'few seconds' (or even faster) of monitoring and assault signals which are desired to be deployed upon that person." (Id. at ⁋ 20.)

Plaintiffs also claim to be in the "category of: interfered-with Pro Se[] Plaintiffs, who are being physically afflicted by Harms" (Id. at ⁋ 3) and that "it is the actual Defendants (or their contract workers) who are the human 'actors' who are conducting the constitutional and human rights violations which the Federal rule plausibly serves to enable, and which the Federal rule failed to carefully prevent." (Id. at ⁋ 4.)

Plaintiffs claim that they participated in the public comment periods regarding the Revised Common Rule, either in an oral presentation or a written submission for both the ANPRM and the NPRM. (See id. at ⁋ 10.) Plaintiff Rabin alleges that, under a "not-quite complete" FOIA request,

to an unknown agency or entity, he received records that he alleges did not include one public comment that he made in 2011.  (Id. at ₱ 12.)  Finally, Plaintiffs allege that the Revised Common Rule included a "vicious grandfather" provision and that Defendants failed to provide notice of this provision.  (Id. at ₱ 69.)

In the "Causes of Action" section of the Amended Complaint, Plaintiffs claim relief in part because: (1) the Revised Common Rule regarding "[human subject protections federal policy] which either do, or which may, enable human research involving physical interventions upon the human body without consent; As such, those sub-parts are in violation of the APA, because they are: Contrary to Constitutional Right(s)" (AC ₱ 68) (brackets in original); (2) the "vicious Grandfather clause" was enacted without notice and is "contrary to constitutional right[s]," (id. at ₱ 69); (3) "Any part or parts of the Policy which individually, or in combination, enable Non-consensual human testing is contrary to constitutional right(s)," (id. at ₱ 70); (4) the Department of Justice unreasonably delayed following up the NPRM with a final rule, (id. at ₱ 73); (5) the "Final Rule was arbitrary, capricious, and abused discretion, to not address, and discuss, that there was an immediate need to protect citizens from Non-Consensual Classified human testing," (id. at ₱ 74); and (6) the "Rulemaking Agencies and OHRP have committed unreasonable delay to not have conducted rulemaking concerning Classified Human Research," (id. at ₱ 75).[5]

Plaintiffs seek declaratory and injunctive relief to protect interests on behalf of others, including "citizens," "victims," and "victim stakeholders" from the non-consensual human research (AC ₱₱ 1, 2) and from the "vicious Grandfather clause" in the Revised Common Rule that

---

[5]     Plaintiff Joy Mack filed a nearly identical lawsuit in the United States District Court for the Northern District of Mississippi alleging the same conduct against the same agencies named herein.  See Mack v. United States of America, et. al., Case No. 23-cv-0013 (N.D. Miss.).  United States Magistrate Judge David A. Sanders filed a report and recommendation recommending that Mack's lawsuit be dismissed with prejudice.  See Mack v. United States of America, et. al., 2023 WL 5198780 (N.D. Miss. Jul. 5, 2023).  Over multiple objections, United States District Court Judge Glen H. Davidson adopted the report and recommendation in full.  See Mack v. United States of America, et. al., 2023 WL 5967556 (N.D. Miss. Sept. 13, 2023).  The United States Court of Appeals for the Fifth Circuit affirmed the dismissal with prejudice.  See Mack v. United States of America, et. al., 2024 WL 1927942 (5th Cir. May 2, 2024.)

allows human research programs to continue, "thereby robbing victims of the hope and actuality that many victims might become freed from the cruel day and night non-consensual testing…." (Id. at ⁋ 1(E).)

## II.    DISCUSSION

### A.    Applicable Law

#### 1.    Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(1).

In discussing the relevant legal standards, the Court considers first its jurisdiction to hear the case.  Federal Rule of Civil Procedure 12(b)(1) permits a party to move to dismiss a complaint for "lack of subject-matter jurisdiction."  FED. R. CIV. P. 12(b)(1).  "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  Lyons v. Litton Loan Servicing LP, 158 F. Supp. 3d 211, 218 (S.D.N.Y. 2016) (quoting Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000)).

The Second Circuit has distinguished between two types of Rule 12(b)(1) motions: (i) facial motions and (ii) fact-based motions.  See Carter v. HealthPort Techs., LLC, 822 F.3d 47, 56–57 (2d Cir. 2016); see also Katz v. Donna Karan Co., 872 F.3d 114, 119 (2d Cir. 2017).  A facial Rule 12(b)(1) motion is one "based solely on the allegations of the complaint or the complaint and exhibits attached to it."  Carter, 822 F.3d at 56.  A plaintiff opposing such a motion bears "no evidentiary burden."  Id.  Instead, to resolve a facial Rule 12(b)(1) motion, a district court must "determine whether [the complaint and its exhibits] allege[ ] facts that" establish subject matter jurisdiction.  Id. (quoting Amidax Trading Grp. v. S.W.I.F.T. SCRL, 671 F.3d 140, 145 (2d Cir. 2011) (per curiam)).  And to make that determination, a court must accept the complaint's allegations as true "and draw[ ] all reasonable inferences in favor of the plaintiff."  Id. at 57 (internal quotation marks and citation omitted).

"Alternatively, a defendant is permitted to make a fact-based Rule 12(b)(1) motion, proffering evidence beyond the complaint and its exhibits." Carter, 822 F.3d at 57; see also MMA Consultants 1, Inc. v. Rep. of Peru, 719 F. App'x 47, 49 (2d Cir. 2017) (defining fact-based Rule 12(b)(1) motion as one where "the defendant puts forward evidence to challenge the factual contentions underlying the plaintiff's assertion of subject-matter jurisdiction").  "In opposition to such a motion, [a plaintiff] must come forward with evidence of their own to controvert that presented by the defendant, or may instead rely on the allegations in the[ir p]leading if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing." Katz, 872 F.3d at 119 (internal citations and quotations omitted).  If a defendant supports his fact-based Rule 12(b)(1) motion with "material and controverted" "extrinsic evidence," a "district court will need to make findings of fact in aid of its decision as to subject matter jurisdiction." Carter, 822 F.3d at 57.  Here, Defendants bring a facial Rule 12(b)(1) motion.

A related issue is that of standing.  To bring a case or controversy within the subject matter jurisdiction of federal courts, a plaintiff must have standing under Article III of the Constitution, which requires "a 'personal stake' in the outcome 'throughout the life of the lawsuit.'" Libertarian Party of Erie Cnty. v. Cuomo, 970 F.3d 106, 121 (2d Cir. 2020), cert. denied sub nom. Libertarian Party v. Cuomo, 141 S. Ct. 2797 (2021) (quoting Cook v. Colgate Univ., 992 F.2d 17, 19 (2d Cir. 1993)); see generally Thole v. U.S. Bank N.A., 590 U.S. 538, 540 (2020).  The "Case" or "Controversy" requirement means that only disputes that meet the "irreducible constitutional minimum" of standing can be heard in a federal forum. Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992); see also Warth v. Seldin, 422 U.S. 490, 498 (1975) (explaining that standing is a "threshold question in every federal case, determining the power of the court to entertain the suit").  To establish standing, a federal plaintiff must prove (i) an "injury in fact," constituting an "invasion

8

of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical"; (ii) "a causal connection between the injury and the conduct complained of"; and (iii) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Id. at 560–61 (internal quotation marks and citations omitted).

Relevant here, "the United States, as sovereign, is immune from suit save as it consents to be sued." Lehman v. Nakshian, 453 U.S. 156, 160 (1981) (internal quotation marks and citation omitted). The United States, therefore, "cannot be sued at all without the consent of Congress," and "when Congress attaches conditions to legislation waiving the sovereign immunity of the United States, those conditions must be strictly observed." Block v. N.D. ex rel. Bd. of Univ. & Sch. Lands, 461 U.S. 273, 287 (1983). "The doctrine of sovereign immunity is jurisdictional in nature, and therefore to prevail, the plaintiff bears the burden of establishing that her claims fall within an applicable waiver." See Makarova, 201 F.3d at 113 (citations omitted). "The shield of sovereign immunity protects not only the United States but also its agencies and officers when the latter act in their official capacities." Dotson v. Griesa, 398 F.3d 156, 177 (2d Cir. 2005) (citing FDIC v. Meyer, 510 U.S. 471, 475 (1994)). That is because actions against federal officers in their official capacities are "essentially a suit against the United States." Robinson v. Overseas Mil. Sales Corp., 21 F.3d 502, 510 (2d Cir. 1994).

**2.      Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6).**

Defendant also argues that Plaintiffs' claims are inadequately pleaded.  Under Rule 12(b)(6), a defendant may seek dismissal of a plaintiff's action for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6).  When considering a motion to dismiss under Rule 12(b)(6), a court must "draw all reasonable inferences in [p]laintiff['s] favor, 'assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to

9

an entitlement to relief.'" Faber v. Metro. Life Ins. Co., 648 F.3d 98, 104 (2d Cir. 2011) (quoting

Selevan v. N.Y. Thruway Auth., 584 F.3d 82, 88 (2d Cir. 2009)); see also Ashcroft v. Iqbal, 556

U.S. 662, 678 (2009).  A plaintiff is entitled to relief if the complaint contains "enough facts to

state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570

(2007); see also In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007) ("While Twombly

does not require heightened fact pleading of specifics, it does require enough facts to 'nudge

[plaintiff's] claims across the line from conceivable to plausible.'" (quoting Twombly, 550 U.S. at

570)).  Moreover, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's

liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"

Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557).

## B.   **Analysis**

Plaintiffs' Amended Complaint seeks declaratory and injunctive relief and requests that the

Court: (1) find invalid the "vicious Grandfather clause," (AC ¶ 69); (2) declare portions of the

Revised Common Rule unconstitutional, (see id. at ¶ 70); (3) modify the Revised Common Rule,

(see id. at ¶ 72); (4) make a finding that the Department of Justice was unreasonably delayed in

following up the NPRM with a final rule, (see id. at ¶ 73); (5) add new vocabulary terms to the

Revised Common Rule, (see id. at ¶ 76); and (6) "[g]rant a temporary restraining order and/or

preliminary injunction upon the Final Rule," (id. at 32, ¶¶ 1, 3).  After considering its ability to

hear the case in the first instance, the Court proceeds to address the pleading issues raised by

Defendants seriatim.

### 1.   **The Court Grants Defendants' Rule 12(b)(6) Motion.**

#### a)   *Plaintiffs' Lack Article III Standing to Bring this Lawsuit.*

To begin with, Plaintiffs seek declaratory and injunctive relief to protect interests on behalf

of others, including "citizens," "victims," and "victim stakeholders" from the non-consensual

human research (AC ¶¶ 1, 2) and from the "vicious Grandfather clause" in the Revised Common Rule that allows human research programs to continue, "thereby robbing victims of the hope and actuality that many victims might become freed from the cruel day and night non-consensual testing…." (Id. at ¶ 1(E).)  It is well settled, however, that pro se plaintiffs cannot bring an action on behalf of other, unidentified individuals.  See Iannaccone v. Law, 142 F.3d 553, 558 (2d Cir. 1998) ("[B]ecause pro se means to appear for one's self, a person may not appear on another person's behalf in the other's cause.").  Accordingly, to the extent allegations in the Amended Complaint are brought on behalf of unidentified individuals or "seek to attempt to represent some of the interests of victims of [o]ngoing alleged and actual non-consensual human testing," the Court dismisses those claims with prejudice.  In any event, even assuming Plaintiffs seek to act on their own behalf, they do not satisfy any of Article III's standing components.

(1)     Injury-in-Fact.

To demonstrate they have suffered an injury-in-fact, Plaintiffs' affidavits seek to describe "injuries from the alleged/actual non-consensual apparent human research related activities and present the likelihood that the Defendant U.S. Government agencies or other agencies of Defendant U.S.A. are conducting this activity." (Pls.' Opp. at 3.)  For example, Plaintiffs allege injuries of illegal interference with—and surveillance of—their bodily and mental functions. See, e.g., Pls.' Exs. 004, 011 ("In 2010 I had incidents of helicopters harassing or doing harm"... [On April 3, 2010, while going for a walk,] "a very small helicopter appeared and was so close I was able to see two men dressed all in black and the one closest to me aimed what looked similar to a gun at me" … "another time a black helicopter came extremely close to my house…"); see also Pls.' Ex. 022 ("Since the beginning of experimentation on me, I have experienced unspeakable violations of my bodily autonomy.  And since, I have had round the clock voice to skull (V2K) transmission into my head, while also being forced to involuntarily share every thought through

11

interrogation, data mining, and probing of my thoughts where they use names, thoughts, and memories to trigger recall of more memories."); id. ("I have been continually stalked, followed and assaulted regularly with directed energy weapons of different types and results while living in Missouri, Georgia, and Colorado, in seven different homes, while on vacations in other states, in Mexico and Canada, in hotels, in my car, and on commercial airlines."); Pls.' Ex. 036 ("In 2002, a surgeon informed me he was forced to place a bio-chip in my chest while I was under anesthesia… Dr. James Sanger stated he was forced to put this chip in my body but refused to tell me who forced him or the purpose of the chip."); Pls.' Ex. 045 ("Employees or agents of the U.S. Government began to target me in an 'overt' manner on October 15, 1990, when they began using electromagnetic-signals transmitted voice contents-clearly understandable and ascribable as such-to my unequipmented head."); Pls.' Ex. 062 ("Another weapon I have endured for over two decades is the military's Voice to Skull (VSK) technology, which is mentally disruptive and intimidate, threatens and tries to manipulate my life.").  In some cases, Plaintiffs provided photographs to substantiate their alleged mental and physical injuries.[6]  In sum and substance, Plaintiffs claim that they are being subjected to "violations of the security of one's person, and the privacy of one's internal bodily processes (including one's thoughts) by high-tech electromagnetic signals monitoring and assault/harassment of the human body and brain, typically day and night." (AC ⁋ 1(F).)

Plaintiffs' theory of harm does not suffice to plausibly allege an injury-in-fact.  An "injury in fact" must be an "invasion of a legally protected interest which is (a) concrete and particularized,

---

[6]     See Pls.' Ex. 017 (photograph of an alleged burn mark on an arm from August 6, 2011); see also Pls.' Exs. 018, 019 (photographs of a plane in the sky on August 23, 2009); Pls.' Ex. 021 (photograph of a man wearing sunglasses and driving a car on October 13, 2012).

and (b) actual or imminent, not conjectural or hypothetical."[7] Lujan, 504 U.S. at 560 (internal

quotations and citations omitted).  Plaintiffs' above-described allegations are entirely "conjectural"

and "hypothetical" rather than "actual" and "concrete."[8] Id.  And as discussed below, Plaintiffs

allegations "rise to the level of the irrational or the wholly incredible" and can only be described

as the "product of delusion or fantasy," not an injury-in-fact.  Khalil v. United States, No. 17-cv-

2652, 2018 WL 443343, at *4 (E.D.N.Y. Jan. 12, 2018).

(2)     Traceability and Redressability.

The requirements of traceability and redressability "often travel together."  Support

Working Animals, Inc. v. Governor of Fla., 8 F.4th 1198, 1201 (11th Cir. 2021) (citing 13A

CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND

PROCEDURE § 3531.5 (3d ed. 2021)); see also Brooklyn Branch of Nat'l Ass'n for the

Advancement of Colored People v. Kosinski, 2024 WL 2846687, at *10 (S.D.N.Y. May 30, 2024).

Traceability requires that the injury is "fairly traceable to the challenged action of the

defendant, and not the result of the independent action of some third party not before the court."

Lujan, 504 U.S. at 560 (alterations adopted).  This requirement "does not create an onerous

standard."  Ateres Bais Yaakov Acad. of Rockland v. Town of Clarkstown, 88 F.4th 344, 352–53

(2d Cir. 2023).  For example, "[a] defendant's conduct that injures a plaintiff but does so only

indirectly, after intervening conduct by another person, may suffice for Article III standing."

Carter, 822 F.3d at 55–56.  Likewise, a plaintiff can show traceability where the injury suffered is

"produced by [the] determinative or coercive effect" of the defendant's conduct "upon the action

---

[7]      "Concreteness" refers to an injury that is "real, and not abstract."  Spokeo, Inc. v. Robins, 578 U.S. 330, 340 (2016) (internal quotation marks omitted).

[8]      Plaintiffs' affidavits detailing covert or electromagnetic surveillance over a period of decades in numerous locations highlight the entirely "conjectural and hypothetical" nature of their allegations, rather than an "actual" or "concrete" injury.  Lujan, 504 U.S. at 560.

13

of someone else." Bennett v. Spear, 520 U.S. 154, 169 (1997).  But for an injury to be considered "fairly traceable," the plaintiff must demonstrate a causal nexus between a defendant's actions and the alleged injury.  Lujan, 504 U.S. at 560 (alterations adopted).

To satisfy the redressability element of Article III standing, "a plaintiff must show that it is 'likely, as opposed to merely speculative, that the alleged injury will be redressed by a favorable decision.'" Soule v. Conn. Ass'n of Schs., Inc., 90 F.4th 34, 47 (2d Cir. 2023) (en banc) (quoting Lujan, 504 U.S. at 561) (internal alteration omitted)).  "A plaintiff makes this showing when the relief sought 'would serve to ... eliminate any effects of' the alleged legal violation that produced the injury in fact." Id. (quoting Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 105–06 (1998)).  Article III therefore requires only that a judgment for Plaintiff "'would at least partially redress' the alleged injury." Id. at 48 (quoting Meese v. Keene, 48 U.S. 465, 476 (1987)).  In this case, the traceability and redressability components of Article III standing are not satisfied either.

As for traceability, Plaintiffs fail to establish any link between Defendants' adoption of the Revised Common Rule and an alleged injury.  (See generally AC.)  Indeed, Plaintiffs fail to identify which, if any, of the named Defendant government agencies are responsible for the claimed monitoring and/or day and night surveillance.  (See id. at ¶ 4 ("AND additionally, we are in a rare sub-category of 'interfered-with Pro Se Plaintiffs where it is the actual Defendants themselves (or their contract-workers) who are the human 'actors' who are conducting the constitutional and human rights violations which the Federal rule plausibly serves to enable, and which the Federal rule failed to carefully prevent.").)  Moreover, nothing in Plaintiffs' affidavits suggest that alleged surveillance is "fairly traceable to the challenged action of" any named defendant in this case. Lujan, 504 U.S. at 560 (internal quotations and alterations omitted).  Although Plaintiffs complain that DOJ has not adopted "the amended/revised core policy for human subjects protections," (see Pls.' Opp. at 15), none of the detailed affidavits attributed this alleged conduct to DOJ.  Indeed,

14

none of Plaintiffs' affidavits attribute specific conduct to even one government agency named as a defendant in this case.[9]  As a result, Plaintiffs fail to satisfy the traceability element of Article III standing.

As for redressability, Plaintiffs' claims of on-going, non-consensual human testing derive from delusion or fantasy.  As such, Plaintiffs cannot plausibly show a "substantial likelihood" that their alleged injuries would be redressed by a favorable decision or by changes in the Revised Common Rule.  Duke Power Co. v. Carolina Environmental Study Grp., Inc., 438 U.S. 59, 74–75, and n.20 (1978).   Indeed, in an action with virtually identical allegations against the same defendants—brought in the District Court for the Northern District of Mississippi by Plaintiff Joy Mack (who was dismissed from this case)—the court dismissed the complaint as not "plausible."  See Mack v. United States, et al., No. 23-cv-0013, 2023 WL 5198780, at *3 (N.D. Miss. Jul. 5, 2023), report and recommendation adopted, No. 23-cv-0013, 2023 WL 5967556 (N.D. Miss. Sept. 13, 2023) ("The plaintiff presented as a pleasant and sincere witness, but the story she told of a shadowy, massive conspiracy, spanning multiple decades, and states, is nevertheless simply not plausible. The undersigned must recommend that the complaint be dismissed. Neither in her original or amended complaints with attached exhibits nor in her testimony, has Mack presented plausible claims. Mack claims to have been monitored, harmed, and subjected to medical procedures to implant and remove monitoring devices over multiple decades and states. . . she is unable to provide any factual support to give substance to the shadowy, malign government

---

[9]      The only allegation that comes close is Plaintiff Vandergriff's "belie[f]" that the FBI was involved (1) because a friend told him about an experience that the friend had at an unspecified time and (2) also because Plaintiff allegedly found a FBI "keystroke-logging" program on his computer at an unspecified time.  Pls.' Ex. 022.  Even though a plaintiff's burden to allege traceability between the injury and the challenged act "is relatively modest" at the pleading stage, Rothstein v. UBS AG, 708 F.3d 82, 92 (2d Cir. 2013), superseded on other grounds by statute, Twitter, Inc. v. Taamneh, 598 U.S. 471, 483 (2023) (quoting Bennett v. Spear, 520 U.S. 154, 171 (1997)) (internal quotation marks omitted), Plaintiff Vandergriff's "belie[f]" does not demonstrate a causal nexus between a defendant's actions and an alleged injury.  See Lujan, 504 U.S. at 560.

conspiracy she believes has bedeviled her life.")  The same is true here.  Accordingly, Plaintiffs fail to satisfy the redressability element of Article III standing too.

Because Plaintiffs do not satisfy any of Article III's standing components, the Court can dismiss the Amended Complaint with prejudice for lack of subject matter jurisdiction under Rule 12(b)(1) without going any further.

b)   *Sovereign Immunity.*

Plaintiffs seem to suggest that Defendants violated their Fourth Amendment right to be free from unreasonable search and seizure, "the Fifth Amendment's proscription against depriving one of life, liberty or property without due process, and the Eighth Amendment's prohibition against the infliction of cruel and unusual punishment."  (AC ¶¶ 49, 65, 70, 71.)

As mentioned, "the United States, as sovereign, is immune from suit save as it consents to be sued." Lehman, 453 U.S. at 160 (internal quotation marks and citation omitted).  "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." Meyer, 510 U.S. at 475.  "The shield of sovereign immunity protects not only the United States but also its agencies and officers when the latter act in their official capacities." Dotson, 398 F.3d at 177 (citing Meyer, 510 U.S. at 475).  That is because actions against federal officers in their official capacities are "essentially a suit against the United States." Robinson, 21 F.3d at 510.  It is the plaintiff's burden to demonstrate that sovereign immunity has been waived. See Makarova, 201 F.3d at 113.

Here, the Amended Complaint names as defendants several federal agencies and the head of each agency in an official capacity.  Any constitutional claims brought against any of the named agencies or the agency heads in an official capacity are dismissed on the grounds of sovereign immunity. See Spinale v. USDA, 621 F. Supp. 2d 112, 120 (S.D.N.Y. 2009) ("The basic rule of federal sovereign immunity is that the United States cannot be sued at all without the consent of

Congress.  This protection applies not only to the United States <u>per se</u>, but also to a federal agency or federal officers acting in their official capacities, because an action against them is essentially a suit against the United States.") (internal citations, alterations, and quotations omitted); <u>see</u> <u>also</u> <u>Platsky v. C.I.A.</u>, 953 F. 2d 26, 28 (2d Cir. 1991) ("[J]urisdictional limitations permit a plaintiff to sue only the federal government officials responsible for violating the plaintiff's constitutional rights; a plaintiff cannot sue the agency for which the officials work.").

To the extent Plaintiffs allege that the Revised Common Rule is arbitrary and capricious because it violates constitutional rights (<u>see</u> AC ¶¶ 69, 72), "the Second Circuit has rejected that view of the APA." <u>Brezler v. Mills</u>, 86 F. Supp. 3d 208, 219 n.9 (E.D.N.Y. 2015) (citing <u>Furlong v. Shalala</u>, 156 F.3d 384, 394 (2d Cir. 1998) (failure to comply with the APA does not give rise to due process claim, because "a statute that simply provides a standard for review of agency action cannot furnish the substantive basis for a claim of entitlement to a property interest.  The APA is merely a procedural vehicle for review of agency action; it does not confer a substantive right to be free from arbitrary agency action.")

c)    *Plaintiffs Are Not Entitled to Jurisdictional Discovery.*

Whether to allow jurisdictional discovery is "a decision as to which a district court enjoys substantial discretion." <u>Reed Int'l, Inc. v. Afghanistan Int'l Bank</u>, 657 F.Supp.3d 287, 298 (S.D.N.Y. Feb. 21, 2023); <u>see</u> <u>also</u> <u>Broidy Cap. Mgmt. LLC v. Benomar</u>, 944 F.3d 436, 446 (2d Cir. 2019) ("[T]he district court has considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction." (quoting <u>Foremost-McKesson, Inc. v. Islamic Republic of Iran</u>, 905 F.2d 438, 449 (D.C. Cir. 1990))).  Yet, "a court ... does not abuse its discretion in denying jurisdictional discovery 'if the party seeking discovery cannot articulate a reasonable basis for the court first to assume jurisdiction.'" <u>Beierwaltes v. L' Off. Federale De La Culture De La Confederation Suisse</u>, 999 F.3d 808, 828 (2d Cir. 2021) (quoting <u>Arch Trading Corp. v.</u>

Republic of Ecuador, 839 F.3d 193, 206–07 (2d Cir. 2016)).  Thus, a plaintiff "is not entitled to jurisdictional discovery if the record shows that the requested discovery is not likely to produce the facts needed to withstand a Rule 12(b)(1) motion."  Haber v. United States, 823 F.3d 746, 753 (2d Cir. 2016) (quoting Freeman v. United States, 556 F.3d 326, 342 (5th Cir. 2009)); see also Gualandi v. Adams, 385 F.3d 236, 244–45 (2d Cir. 2004) (affirming denial of jurisdictional discovery at the motion to dismiss stage where plaintiffs "were unable to demonstrate that additional discovery was needed in order to decide the jurisdictional issue").  Indeed, "a party opposing a Rule 12(b)(1) motion cannot rest on the mere assertion that factual issues may exist." Exch. Nat. Bank of Chicago v. Touche Ross & Co., 544 F.2d 1126, 1131 (2d Cir. 1976).  Moreover, "[a] party seeking jurisdictional discovery, like a party seeking other kinds of discovery, bears the burden of showing necessity."  Molchatsky v. United States, 778 F. Supp. 2d 421, 438 (S.D.N.Y. 2011), aff'd, 713 F.3d 159 (2d Cir. 2013) (internal quotation marks and citation omitted).

Plaintiffs here have not met that burden, so the Court denies their request that the Court delay deciding Defendants' motion to dismiss until after a period of discovery.[10]  (See Pls.' Opp. at 4.)  Here, Plaintiffs seek: (1) "at least, admission or confirmation by Defendants: for each Plaintiffs, that he/she has been a subject of U.S. Government conducted or sponsored non-consensual human testing; hopefully further: that the testing upon him/her involves electromagnetic-signals interventions upon their physical human body; further: approximately how many citizens have been subjected to non-consensual, day and night, human testing within the past year ...[,]" (Pls.' Opp. at 5); (2) the "regulatory mechanisms by which informed consent has been waived or omitted for this testing… to establish that the rulemaking enabled continuance of harm (or degree of harm) [the 2nd component of Standing], as well as the likelihood that the

---

[10]     Plaintiff Rabin has apparently submitted requests to the government under the Freedom of Information Act. 5 U.S.C.§ 552 ("FOIA"), but he does not specify what, if any, documents or the number of documents he has received. (See AC ¶ 12.)

relief requested would at least partly alleviate the Harms upon Plaintiffs," (id.); (3) to ask a government employee if she confirmed or attempted to confirm that the "non-consensual classified human research alleged by victims was in fact taking place," (id. at 7); (4) information from the surgeon who allegedly told Plaintiff Waller that he was ordered to implant a biochip in her and release that doctor from any "secrecy obligation" to the "U.S. Government concerning that matter," (id.); and (5) information about Office for Human Research Protections' interpretation of two parts of the Revised Common Rule, (id. at 7–8).

In the Court's view, Plaintiffs' allegations, as discussed below, are fanciful and delusional. Moreover, no amount of discovery into the above suggested items—to the extent they even exist— would lead to Plaintiffs' ability to establish Article III standing. Indeed, Plaintiffs do not claim that any of their requested discovery relates to alleged violations of rulemaking under the APA.[11] Rather, Plaintiffs seek to prove their fanciful, delusional allegations that they are being covertly monitored by some unnamed government entity. Plaintiffs are thus not entitled to jurisdictional discovery because "the record shows that the requested discovery is not likely to produce the facts needed to withstand a Rule 12(b)(1) motion."[12] Haber, 823 F.3d at 753 (internal quotations and citations omitted).

### 2.     The Court Would Also Grant Defendants' Rule 12(b)(6) Motion.

Considering Plaintiffs cannot satisfy any of Article III's standing components, the Court need not proceed to the adequacy of their pleadings. For the sake of completeness, however, the Court considers Defendants' arguments in support of dismissal of Plaintiffs' APA claim under Rule

---

[11]     Although Plaintiffs are not entirely clear about their request for OHRP's interpretations of the Revised Common Rule, they may access the public website for the United States Department of Health and Human Services that contains a wealth of information about the Revised Common Rule.

[12]     Plaintiffs cite two cases for the proposition that this Court should allow discovery before it decides a motion to dismiss. (See Pls.' Opp. 8.) Neither case is binding on this Court nor involves the APA. See Ignatiev v. United States, 238 F.3d 464 (D.C. Ct. App. 2001); see also Lopes v. Jet SetDC, LLC, 4 F. Supp. 3d 238 (D.D.C. 2014)

12(b)(6).  Even assuming <u>arguendo</u> Plaintiffs can demonstrate standing (which they cannot), the Court agrees with Defendants' arguments and would grant their motion to dismiss on the merits too.

a)   *Plaintiffs Fail to State a Claim Under the APA.*

The APA establishes the procedures federal administrative agencies use for "rule making," defined as the process of "formulating, amending, or repealing a rule."  5 U.S.C. § 551(5); <u>see also</u> <u>Perez v. Mortg. Bankers Ass'n</u>, 575 U.S. 92, 95 (2015).  "Rule" is defined broadly to include "statement[s] of general or particular applicability and future effect" that are designed to "implement, interpret, or prescribe law or policy."  5 U.S.C. § 551(4); <u>see also</u> <u>Perez</u>, 575 U.S. at 95–96.

The APA requires agencies to publish proposed "rules" in the Federal Register and seek public comment before settling on a final version.  5 U.S.C. §§ 553(b)–(c).  Specifically, before promulgating a "rule," an agency must publish a "[g]eneral notice of proposed ... rule making ... in the Federal Register" and provide the public with "an opportunity to participate in the rule making through submission of written data, views, or arguments."[13]  <u>Id.</u>; <u>see also</u> <u>Saget v. Trump</u>, 375 F. Supp. 3d 280, 362 (E.D.N.Y. 2019).  "An agency must consider and respond to <u>significant</u> comments received during the period for public comment."  <u>Perez</u>, 575 U.S. at 96 (emphasis added).  Such "[c]omments must be significant enough to step over a threshold requirement of materiality before any lack of agency response or consideration becomes of concern."  <u>Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.</u>, 435 U.S. 519, 553 (1978).  Indeed, "the notice-and-comment provision of the APA … has never been interpreted to require an agency

---

[13]        Section 4 of the APA, 5 U.S.C. § 553, prescribes a three-step procedure for so-called "notice-and-comment rulemaking."  <u>Perez</u>, 575 U.S. at 96.  First, the agency must issue a "[g]eneral notice of proposed rule making," ordinarily by publication in the Federal Register. 5 U.S.C. § 553(b).  Second, if "notice [is] required," the agency must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments."  5 U.S.C. § 553(c).  Third, when the agency promulgates the final rule, it must include in the rule's text "a concise general statement of [its] basis and purpose."  5 U.S.C. § 553(c).

to respond to every comment, or to analyse every issue or alternative raised by comments, no matter how insubstantial." Am. Mining Cong. v. U.S. EPA, 907 F.2d 1179, 1188–89 (D.C. Cir. 1990) (alterations adopted); see also New York v. U.S. Dep't of Health & Hum. Servs., 414 F. Supp. 3d 475, 556 (S.D.N.Y. 2019) (holding that a federal agency does "not have an obligation to respond to every comment") (internal quotation marks omitted).

Relevant here, HHS published an advanced notice of proposed rulemaking ("ANPRM") seeking public comments on seventy-four specific questions about revisions to the Common Rule. See 76 Fed. Reg. 44512, 44529 (July 26, 2011). The ANPRM also specified that in addition to responding to the specific questions, "general comment is invited on the current system of protections for human research subjects as implemented through the Common Rule." Id. Further, HHS published a Notice of Proposed Rulemaking ("NPRM"), which sought additional public comments. See 80 Fed. Reg. 53933 (September 8, 2015).

Even if Plaintiffs could establish standing, which they cannot, Plaintiffs' allegations that Defendants violated the APA are vague, conclusory, and simply mimic the statutory language. For example, Plaintiffs claim that the "Final Rule does not reasonably address the rulemaking administrative records being filled with a preponderance of consistent allegations of a yet ongoing modern day 'high tech Tuskegee experiment.'" (AC ¶ 1(D).) They further allege—in a wholly implausible allegation, which merely includes some of the APA's language—that the "current 'high tech' non-consensual Human-testing program conducts remotely-delivered interventions upon the human body and neurological systems, and the human brain. [arbitrary, capricious, and an abuse of discretion; and inconsistent with the legal history, whereby the National Research Act of 1974 was brought about in reaction to the abuses of the Tuskegee Experiments, and sought to make protective human research policies to prevent related future abuses and to stop present abuses when rulemaking or regulatory bodies learn of them;]." Id. (alterations and quotations in original).

Plaintiffs do not allege that Defendants failed to meet APA's requirements for rulemaking procedures: notice and publication in the Federal Register, as well as soliciting public comments. Indeed, Plaintiffs state that they actively participated in the rulemaking process.  (See AC ¶ 10) (Plaintiff Rabin "submitted written public comment to a public comment period of the Presidential Commission for the Study of Bioethical Issues. . . [.]"); see also id. at ¶ 14 ("Plaintiff Catherine E. Ryan. . . participated actively in the rulemaking and submitted Public Comments to each of the ANPRM and NPRM"); id. at ¶ 15 ("Plaintiff Lisa Waller … participated diligently in the rulemaking, and submitted Public Comments to each of the ANPRM and the NPRM.");[14] id. at ¶ 16 ("Plaintiff Peter D. Rosenholm. . . participated actively in the NPRM stage of the rulemaking, and submitted Public Comment to the NPRM."); id. at ¶ 17 ("Plaintiff J. Chad Vandergriff. . . submitted a written Comment to the Bioethics Commission during their 2011 public comment period, and submitted a Public Comment to the NPRM."); id. at ¶ 18 ("Joy N. Mack. . . participated in the NPRM rulemaking with her NPRM Public Comment."); id. at ¶ 19 ("Additionally, Plaintiffs Norman Rabin, Catherine Ryan, and Peter Rosenholm, were among approximately 5 victims who attended the Dec. 3, 2015 meeting of SACHRP ["'Sack-Harp', the HHS Secretary's Advisory Committee on Human Research Protections] during the time of the Federal rulemaking, and each delivered spoken and/or written comment to that meeting.")).[15]

Seemingly in attempt to get around this reality, Plaintiffs ask this Court to determine whether certain public comments were part of the Administrative Record.  (See Defs.' Mot. at 15.) Confoundingly, however, Plaintiffs also assert in their Amended Complaint that the public comments are part of the Administrative Record and are "findable online."  (AC ¶¶ 20, 52, 53.)

---

[14]      Plaintiff Lisa Waller is formerly known as Lisa Becker.  (See AC ¶ 15.)  She spoke at two public hearings under the name Lisa Becker.  (See Defs.' Mot. at 15 n.5.)

[15]      The videotaped public comments are available at https://www.hhs.gov/ohrp/sachrpcommittee/meetings/2015-december-3-4/index.html with the meeting dates of December 3 and December 4, 2015 (last visited, July 8, 2024).

Plaintiffs also rely on a "not quite-complete FOIA request" to suggest that one of Plaintiffs' comments was not part of the record. But this mere speculation does not require a review of the entire record.

In any event, as reported in the Federal Register, thousands of public comments were considered before the enactment of the Revised Common Rule. See 80 Fed. Reg. 53933, 54033 ("Public comments on the ANPRM initially were requested by September 26, 2011; however, in response to public requests for an extension, the comment period was extended until October 26, 2011. A total of 1,051 comments were received, with many commenters responding to all 74 questions posed.") (emphasis added); see also 82 Fed. Reg. 7149, 7151 ("The revisions to the Common Rule are based on a variety of sources of public, stakeholder, and expert comments and advice, including comments received on the 2011 ANPRM and the 2015 NPRM."); 82 Fed. Reg. 7152 ("The NPRM received more than 2,100 public comments, the majority of which were from people writing in their individual capacity.") (emphasis added).

Plaintiffs allege that Defendants "ignored numerous, rational[,] and reasonable 'Victim Stakeholder' Public Comments. . . to not be subjected to violations of the security of one's person, and the privacy of one's internal bodily processes (including one's thoughts) by hightech electromagnetic signals monitoring and assault/harassment of the human body and brain, typically day and night."[16] (AC ¶ 1(F).) Plaintiffs refer to the transcripts of public comments made at public hearings that are found at: (1) https://bioethicsarchive.georgetown.edu/pcsbi/node/203.html; and (2) https://bioethicsarchive.georgetown.edu/pcsbi/node/225.html. (See id. at ¶13; see also Leonardo Decl., Exs. B, C.) After reviewing the transcripts, the Court concludes that many of the

---

[16]     Relatedly, Plaintiffs also allege that at least 75 people complained during the NPRM public comments about being "experimented upon without consent." (AC ¶ 49.)

23

public comments were delusional.[17]  And in any event, Defendants are not required under the APA to "respond to every comment, or to analyse every issue or alternative raised by comments, no matter how insubstantial."  Am. Mining Cong., 907 F.2d at 1187–88 (alterations adopted).  Under the APA, the only requirement is that the agency consider comments that are "significant."  Perez, 575 U.S. at 96.  "Significant comments are those 'which, if true, raise points relevant to the agency's decision and which, if adopted, would require a change in an agency's proposed rule.'" City of Portland v. EPA, 507 F.3d 706, 714–15 (D.C. Cir. 2007) (quoting Home Box Office, Inc. v. FCC, 567 F.2d 9, 35 n.58 (D.C.Cir.1977) (emphasis omitted)).  Assuming the public comments here are even true, they are not rational, material, or "significant enough to step over a threshold requirement of materiality before any lack of agency response or consideration becomes of concern."  Vermont Yankee Nuclear Power Corp., 435 U.S. at 553.  Simply put, the public comments Plaintiffs cite—even if analyzed—would not have changed the provisions of the proposed Revised Common Rule.  Here, Defendants published notice of the proposed rulemaking twice and allowed for public comments under the APA.  Plaintiffs make no claims to the contrary.

---

[17]  See, e.g., Leonardo Decl., Ex. B at 4 ("I strongly believe that I have been targeted for the experimentation of brain research since September 2008, without my consent. They are controlling my mind and using electronic remote control device to send instruction. In the past two and a half years, I have been subjected to constant electric shock, a sleep disturbance, a sleep deprivation, short breaths, severe localized pain into various parts of my body, telephone and bell rings in my ears, heat waves through my body, horrifying dreams, creating sudden fear and worries in my mind."); see also id. at 5 ("I am a part of the group that is here today representing those who are receiving the electromagnetic torture and even my daughter at five months old. . . [.]  I believe she is also a victim of the electromagnetic torture."); id. at 6 ("I am an eight year victim survivor of assaults by directed energy weapons. The torture I have experienced consists of body overheating, body extremely cold, seizures, heart pain, earaches, itching behind eyes, burning behind eyes, swelling, headaches, involuntary movement of my limbs, exhaustion, speeding and heart racing, hair coming out by the handfuls as if I have had chemotherapy, mind paralysis, being hypnotized or being placed in a trance-type state, being tracked by a drone or satellite, controlled dreams, sleep deprivation, V2K which is voice to skull, projected sound, extreme muscle spasms and extreme muscle cramps; being made to fall down; blue circles around the pupils of my eyes and I am here and you can look at them if you like; low frequency noises in my home; high frequency noises in my home; sexual stimulation."); id. at 8–9 (Plaintiff Lisa Waller stated: "I speak for many when I say we have suffered long enough. My personal experience has been ten years. I have been vilified. I have been tortured. I have burns on my body."); id. at 10 (Plaintiff Peter Rosenholm stated: "Like all the others, we go through this every day, at least 14 years now of being tortured. It is nonconsensual human experimentation. It is remote. It is covert. It is hard to prove it a lot of times. Many of my attacks were microwave weapons, MEDUSA is one"); Ex. C, at 4 ("I've been a victim of ongoing nonconsensual human subject experimentation for my entire adult life, and possibly may have been a victim since my childhood. I have been targeted with ongoing microwave weapons, as well as drugging with neurotoxic contaminants covertly placed on articles of clothing, as well as on other personal possessions.").

Thus, Plaintiffs cannot show that Defendants' adoption of the Revised Common Rule was arbitrary and capricious, an abuse of discretion, or contrary to law.

Plaintiffs also allege that Defendants did not provide notice about the "grandfather" provision.  (See Defs.' Mot. 18.)  That is not true.  Contrary to Plaintiffs allegations, a specific reference to notice about the "grandfather" clause is in the ANPRM.  See 76 Fed. Reg. 44512, 44524 ("Question 52: Should the new consent rules be applied only prospectively, that is, should previously existing biospecimens and data sets be "grandfathered" under the prior regulatory requirements?  If so, what are the operational issues with doing so?"); see also 80 Fed. Reg. 53933 ("Commenters noted concerns about imposing consent requirements on the use of biospecimens already collected that is, not grandfathering in such resources—especially if these biospecimens are non-identified.").  The NPRM also described the transition provisions including that: "(1) Research initiated prior to the compliance dates.  Ongoing human subjects research in which human subjects (as defined by this policy) were involved prior to the compliance dates for the cited provisions need not comply with the additional requirements...[.]"  See 80 Fed. Reg. 54046 (September 8, 2015).

Plaintiffs also erroneously claim that there was no notice regarding the transition provisions.  (See AC ⁋ 69(5)).  The Revised Common Rule specifically refers to public comments received about the transition provisions.  See 83 Fed. Reg. 28497, 28502 ("As with the comments on the interim final rule, a few comments expressed concern with the waiver provision at § ___.101(i) allowing federal departments and agencies to waive some or all provisions of the Common Rule (which could allow research to be conducted on people without their informed consent.")."  The notice in the Federal Register refers to having received comments and also explains:

> We are not contemplating modifying the carve-outs from the definition of research. Regarding the carve-out from the definition of research pertaining

to authorized operational activities in support of national security missions, the January 19, 2017 final rule preamble noted that "[t]hese authorized operational activities, as determined by each agency, do not include research activities as defined by the Common Rule, nor have they ever in the past been considered regulated by the Common Rule. This category of activity is removed from the definition of research to make explicit that the requirements of the final rule do not apply to authorized operational activities in support of national security missions. This clarification is not intended to narrow the scope of the Common Rule.

83 Fed. Reg. 28497, 28502.

Finally, Plaintiffs allege "unreasonable delay" by: (1) DOJ in not "signing on" to the Revised Common Rule and (2) by Defendants in not enacting a rule about Classified Human Research.  (AC ⁋ 75) ("By now, the Rulemaking Agencies and OHRP have committed an unreasonable delay to not have conducted rulemaking concerning Classified Human Research."). Even assuming <u>arguendo</u> Plaintiffs could establish standing, which they cannot, 5 U.S.C. § 706(1) does not allow private parties to seek wholesale improvements to agency programs.  <u>See</u> <u>Lujan v. Natl. Wildlife Fed'n</u>, 497 U.S. 871, 891 (1990) (noting that "programmatic improvements" must be sought in Congress or at the agency and not through the courts under the APA).  Further, a "claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take."  <u>Norton v. S. Utah Wilderness All.</u>, 542 U.S. 55, 64 (2004).   Plaintiffs have not made any such allegations.  Moreover, contrary to Plaintiffs' allegations, the Revised Common Rule in fact addressed "Classified Human Research" and contains a carve-out provision for such research.  <u>See</u> 82 Fed. Reg. 7149, 7177 (January 19, 2017).

        b)    *The Doctrine of Res Judicata Bars Plaintiff Rabin's Claims.*

The doctrine of res judicata, also known as claim preclusion, bars re-litigation if "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the same parties or those in privity with them; and (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action."  <u>Monahan v. N.Y.C. Dep't of Corr.</u>, 214 F.3d 275, 285

(2d Cir. 2000). Plaintiff Norman Rabin has already litigated his claims of constitutional violations stemming from satellite surveillance, so he is barred from doing so again. Plaintiff Rabin's prior claims against the government stemming from the same alleged monitoring have been previously considered and dismissed by this Court. See Rabin v. U.S. Dept. of State, C.I.A., 980 F. Supp. 116 (E.D.N.Y. 1997), aff'd Rabin v. United States, 210 F.3d 355 (2d Cir. 2000) ("The 1993 action, like the present case, alleged constitutional violations resulting from 'satellite(s) based signals-assaults,' 'assaultive signal-monitorings,' and 'biofrequency voice-transmissions,' and sought money damages and a permanent injunction. The district court dismissed the 1993 action against the United States for lack of subject matter jurisdiction based on federal sovereign immunity."). Indeed, the Second Circuit held that Plaintiff Rabin's claims were barred by res judicata. See Rabin, 210 F.3d at 355. Here too, Plaintiff Rabin's attempts to relitigate his allegations of constitutional violations stemming from satellite surveillance are barred.

      c)    *There is No Private Right of Action Under the Revised Common Rule.*

Seeking declaratory and injunctive relief, Plaintiffs request that the Court, in part: (1) declare portions of the Revised Common Rule unconstitutional, (see AC ⁋ 70); (2) modify the Revised Common Rule, (see id. at ⁋ 72); and (3) add new vocabulary terms to the Revised Common Rule, (see id. at ⁋ 76). Assuming arguendo again that Plaintiffs have standing to sue (which they do not), there is no private right of action under the Revised Common Rule to directly challenge and change its provisions. See Thomas v. Catlin, 141 F. App'x 673, 674 (9th Cir. 2005) ("The district court properly held [plaintiff] failed to state a claim under 45 C.F.R. §§ 46.101, et seq., the federal statute regulating research involving human subjects, because the statute does not confer a private right of action.") (citing Alexander v. Sandoval, 532 U.S. 275, 286 (2001) ("[P]rivate rights of action to enforce federal law must be created by Congress.").)

d)      *Plaintiffs' Claims are Delusional.*

This Court can also dismiss Plaintiffs' claims because they "rise to the level of the irrational or the wholly incredible" and can only be described as the "product of delusion or fantasy." Khalil, 2018 WL 443343, at *4 (quoting Denton v. Hernandez, 504 U.S. 25, 33 (1992)).  The Court may have "no basis to doubt the sincerity of Plaintiff's beliefs[, but] the allegations exhibit a level of delusional paranoia that makes the continuation of this vexatious litigation an unjustified expenditure of public and private resources." Kraemer v. City of N.Y., No. 19-cv-6671, 2020 WL 1974204, at *4 (S.D.N.Y. Apr. 24, 2020).   The Court has "no obligation to entertain pure speculation and conjecture." Gallop v. Cheney, 642 F.3d 364, 368 (2d Cir. 2011).  This Court may dismiss a complaint "when the factual contentions are clearly baseless, such as when allegations are the product of delusion or fantasy.  Or, second, it may dismiss when the claim is based on an indisputably meritless legal theory." Nance v. Kelly, 912 F.2d 605, 606 (2d Cir. 1990) (internal citations and quotations omitted).  "A finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible." Denton, 504 U.S. at 33.

Here, Plaintiffs' allegations are clearly frivolous and baseless, and the Court would dismiss the Amended Complaint under 28 U.S.C. § 1915 (e)(2)(B) even if it concluded Plaintiffs had Article III standing to sue.  Plaintiffs' claim that they are "subjected to violations of the security of one's person, and the privacy of one's internal bodily processes (including one's thoughts), by high-tech electromagnetic signals monitoring and assault/harassment of the human body and brain, typically day and night" and "are being physically afflicted by Harms which are taking place plausibly due to the here alleged unjust enactments of the Final Rule" are certainly delusional. (AC ⁋⁋ 1(F), 2.)  Accordingly, the Amended Complaint could be dismissed with prejudice on this alternative ground because it is "replete with fantastic and delusional scenarios." Mecca v. United States, 232 F. App'x 66, 66 (2d Cir. 2007).

### III.      CONCLUSION

For the above reasons, Defendants' Motion to Dismiss Plaintiffs' Amended Complaint is GRANTED in its entirety.   Plaintiffs' Amended Complaint is DISMISSED with prejudice. Plaintiffs' Motion for Extension of Time to Re-File Their Late Affidavits is DISMISSED AS MOOT.  The Clerk of Court is respectfully directed to close ECF Nos. 31 and 40, enter judgment, and close this case.

**SO ORDERED.**

Dated:   July 9, 2024
            Central Islip, New York

_____
            /s/ JMA
            JOAN M. AZRACK
            UNITED STATES DISTRICT JUDGE